**45 C.C.P.A. (Patents)**

## Philip E. HAULTAIN, Appellant,

v.

## Herbert John DE WINDT, Appellee.

### Patent Appeal No. 6289.

United States Court of Customs and Patent Appeals.

April 11, 1958.

Marcus Lothrop, San Francisco, Cal., and Bacon & Thomas, Washington, D. C., for appellant.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City (Merton S. Neill, New York City, and Clarence M. Fisher, Washington, D. C., of counsel), for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON, retired, Associate Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences in Interference No. 86,827, awarding priority to the junior party DeWindt. The involved applications are DeWindt's "Conveyor Flight Belt," filed May 29, 1953, serial No. 358,482, assigned to the Ton-Tex Corporation, and Haultain's "Cleated Belt" filed June 9, 1952, serial No. 292,-472.

The single count involved is as follows:

"A cleated belt comprising a belt web including reinforcing plies and a rubber-like superficial portion, *there being a gap* in said superficial portion to expose said reinforcing plies, a cleat member capable of vulcanization and including reinforcing plies bent into an L-shape, the leg of the L being disposed at a right

angle to said web and the foot of the L being disposed parallel to said web in said gap in contact with said reinforcing plies, and a rubber-like superficial portion on said cleat member *merging smoothly* with said superficial portion of said web, said superficial portions, said cleat member and said web being vulcanized together." (Emphasis ours.)

The board awarded DeWindt a conception date of October 16, 1951 and held that he actually reduced the invention to practice on June 4, 1952.

The board awarded appellant, Haultain, a conception date of "early in 1952" but held that the evidence did not establish an actual reduction to practice by him.

The subject matter of the instant interference is the construction of a cleated conveyor belt. More specifically, the invention involves the use of an inverted "T" shaped, or double "L" shaped cleat. The inverted "T" is placed in a gap or depression formed in the belt surface. For example, in a five ply belt, one or two plies are removed transversely of the belt, forming a gap having a width sufficient to accommodate the base of the cleat, i. e., the top of the "T". The cleat is then vulcanized into the belt and becomes an integral part thereof.

Haultain contends that DeWindt was not diligent between conception and reduction to practice; that the belts actually made by DeWindt do not conform to the count, in that they lack a superficial rubber-like layer; that the tests run by DeWindt do not constitute an actual reduction to practice and as such do not overcome Haultain's filing date; and that Haultain had an actual reduction to practice before the filing of his application.

■ DeWindt contends that he had a conception and an actual reduction to practice before Haultain's filing date and that Haultain has no actual reduction to practice and must rely on his filing date. It is well to note that the earliest date the preliminary statement of DeWindt alleges is the latter part of 1950, and proof of any earlier date will establish no date earlier than the date alleged in said statement. Further, where testimony merely places the acts within a stated time period, the inventor has not established a date for his activities earlier than the last day of the period.

■ There is testimony of conception of the invention by DeWindt in late July 1950. There is also testimony by various witnesses for DeWindt who speak of sketches and samples being made following that date, but none of these samples or sketches was produced and we do not find the testimony at all convincing. We find no clear or convincing evidence which would establish conception by DeWindt prior to August 17, 1951, when he prepared a sketch which was sent to one Meyers, a Ton-Tex sales manager, who received it on October 16, 1951, for delivery to Ton-Tex's patent counsel for search purposes. Chapman and Beaman, officials of Ton-Tex and familiar with the development of the DeWindt work, both testified that they saw the sketch made by DeWindt, apparently at Beaman's request, before it was sent to Meyers. Chapman and Beaman did not state *when* they saw the sketch, but did indicate that the particular sketch was the one they saw, and the record shows a carbon copy of a letter dated October 16, 1951 from Beaman to Meyers wherein the sketch is referred to. The letter also mentions a sample being forwarded under separate cover. The sample is identified as one of the exhibits before us. The sketch clearly shows the structure defined by the count except for the "rubber-like superficial portion" of the belt web. However, we believe this lack is overcome by the sample to which the letter refers. Counsel for Haultain argues vigorously that the outer surface of the belt is not rubber-like. We have examined the exhibit and find, despite the fact that surface has somewhat the texture of canvas, that the surface is also impregnated with a rubbery substance which forms a very thin film over the entire surface which, we feel, satisfies the above-mentioned lan-

guage. This evidence, we feel, fully supports the board's finding that DeWindt conceived at least as early as October 16, 1951.

 DeWindt claims that the earlier use of a "Dutchman," which is a section inserted into an existing belt, containing a single flight or cleat, alleged to have been made and tested by March 13, 1951, constituted an actual reduction to practice as of that date. Assuming, without deciding, that the "Dutchman" embodied the invention here in issue, we agree with the board that the test was legally insufficient in view of the inter-office memorandum, addressed to Chapman, the pertinent portion of which reads:

"In July 1951, Ternstedt Eng Dept stated the test made on the sample seemed very good but that for test purposes a complete belt would give a far more satisfactory test. You see the pieces dropping on the conveyor are very slow and the sample piece of flight belt only carried approx one piece every 45 minutes."

Therefore, we agree that the alleged March 13, 1951 test does not establish an actual reduction to practice. Balogh v. Crot, 176 F.2d 923, 37 C.C.P.A., Patents, 707; Martin v. Snyder, 214 F.2d 177, 41 C.C.P.A., Patents, 1010.

As indicated above, Ternstedt wished a complete belt in order to perform the required testing. Subsequently an estimate of cost and a three flight section were sent to Ternstedt. This too was inserted as a Dutchman. We feel this second test also fails to show an actual reduction to practice for the same reason as the first single flight belt section. Ternstedt was still not satisfied with the test of anything less than a complete belt.

Eventually, however, Chapman elected to send a complete belt to a Ford Motor Company plant, for which no charge was made. There appears to be a little confusion as to the exact date when the test belt was installed in the Ford plant, but there is a confirmatory paper from Ford dated May 16, 1952, wherein receipt of the test belt is acknowledged. That the Ford belt conformed to the count (and to the earlier-mentioned sample sent for a patent search) is deemed to be adequately corroborated by the testimony of Peddicord and Chapman.

The following testimony of Peddicord we think adequately establishes that the test belt was satisfactory and tested under actual working conditions:

" * * * * *

"Q105. Was that belt then delivered to Ford? A. That belt was delivered to Ford inside of the next two or three days, which was delivered by Mr. Peabody.

"Q106. Did you ever see that belt in operation at the Ford Highland Park plant? A. I checked on this operation myself in the latter part of May of that year.

"Q107. Do you recall whom you saw at the Ford plant at that time? A. As this program was—or, I should say, the original inquiry and talks were with Mr. Phil Grushaw; then on my visit for inspection in May of '52, Mr. Grushaw himself personally, and Mr. Peabody and myself, inspected the belt, which was in operation at that time.

"Q108. How was it being used? A. This was being used as a conveyor for the valve-guide job off of an automatic machine.

"Q109. Do you recall anything as to the speed of the belt? A. I would say this probably ran around approximately 80 to 100 feet per minute.

"Q110. And what was it doing with the parts that were being discharged on to it? A. These parts were being elevated into a box.

"Q111. Did you have occasion to inspect the belt, stationary? A. As I recall we were there just before the noon break, and at my suggestion I asked Mr. Grushaw if it would be possible to wait, so that we might inspect this belt when it was stopped.

"Q112. Did you do so? A. We did.

"Q113. What was the condition of the belt? A. The condition of the belt was very oily, very dirty; but my principal interest in this belt was to check on the condition of the vulcanized flights.

"Q114. And what was the condition of the flights? A. The belt did not show any separation of the flight vulcanized to the belt.

"Q115. Then how would you characterize the condition and use of the belt at the Ford plant? A. I would say that the condition of the belt and the usage of the belt was very satisfactory.

"* * * * *"

Haultain attacks Peddicord's testimony, that he saw the belt at Ford in May of 1952, on the ground he made conflicting statements showing he was in California at the time. We have carefully read the testimony and are not persuaded it is self-contradictory in this respect or that Peddicord was an unreliable witness.

Haultain again argues that the Ford belt does not, upon inspection, appear to support the count due to the absence of a superficial rubber-like portion. The board indicated that it felt the argument was of no merit and we agree.

The record next shows that on June 4, 1952 there was a verbal order for and a request from Ford for quotations on two 72 foot cleated belts, on June 6, 1952 the quotations were supplied, and on June 20, 1952, there was a written Ford order for the belts confirming the verbal order. The belts themselves were shipped to Ford on July 23, 1952.

The purchase by Ford of the two 72 foot belts tends to confirm our opinion that the belt had been successfully tested and operated, as testified by Peddicord, at least as early as June 4, 1952.

Haultain argues that DeWindt was not diligent during a three or four month period during which Haultain conceived and reduced to practice the invention. As we view the case it is not necessary to consider diligence. For the reasons hereinafter given, we do not believe Haultain had an actual reduction to practice of the invention of the count; rather, he must stand on his filing date, June 9, 1952, for a constructive reduction to practice. This leaves DeWindt as the first to conceive and the first to reduce to practice.

Haultain has submitted three exhibits F, A-2, and A-3 as indicating his work. Exhibits F and A-2 do not meet the terms of the count. These exhibits were testified to as being indicative of the types of belts actually installed by Haultain and neither of these shows the "gap," as called for in the count, into which the cleat feet are set. Also, in our opinion, neither of them meets the smooth merger limitation of the count. We do not press as strict a definition of smooth merger as did the board, but feel that the cleats of exhibit A-2 and exhibit F certainly do not merge smoothly with the web by any definition.

Therefore, Haultain must prove actual reduction to practice of a belt which is similar to his exhibit A-3 embodiment if he is to meet the terms of the count, for that exhibit, in our opinion, does have a smooth merger and a "gap."

The record indicates three belts were made by Haultain with the "T" cleat, one for Westinghouse, one for Western Meat Company, and one for the Union Ice Company.

One Edutis testified he saw a belt "approximately like A-3 in operation." We are constrained to hold this is not positive enough identification to establish that the belt installed at Western was the same as A-3, or even nearly like it, for exhibits F and A-2 are "approximately" like A-3. We find no other testimony indicating that A-3 was the type used at Western or elsewhere.

The Westinghouse belt is stated to be exactly the same as exhibit F since that exhibit was cut therefrom. This belt does not meet the limitations of the count, for reasons above stated.

The only other belt made and put in operation by Haultain was the Union Ice Company belt. Mr. Nolting, a maintenance machinist for Union, testified that the Union belt most closely resembled exhibit A–2 and produced photographs to prove his point. Our examination thereof indicates closer resemblance to F, but in either case, the count is not met. Therefore, Haultain must rely upon his filing date for constructive reduction to practice, which date is five days subsequent to DeWindt's actual reduction to practice. This being so, the party De-Windt must prevail.

The decision of the board is therefore affirmed.

Affirmed.

JACKSON, J., retired, recalled to participate.