ENGELHARD MINERALS AND CHEMICALS CORPORATION, Plaintiff,

v.

ANGLO–AMERICAN CLAYS CORPORATION, et al., Defendants.

Civ. A. No. 80–187–MAC.

United States District Court,
M.D. Georgia,
Macon Division.

April 25, 1984.

436

Frank C. Jones, Atlanta, Ga., Kurt E. Richter, New York City, for plaintiff.

Jerry B. Blackstock, Atlanta, Ga., Stefan J. Klauber, Paramus, N.J., George C. Grant, John B. Harris, Jr., Macon, Ga., Allan H. Bonnell, Dana M. Raymond, Michael T. Schaffield, New York City, Raul V. Fonte, Belle Chasse, La., for defendants.

OWENS, Chief Judge:

Plaintiff, an assignee of United States Patent Number 3,586,523 (copy reproduced as an Appendix to this opinion), commenced the instant action seeking injunctive relief and damages due to defendants' alleged infringements of the patent in suit. The defendants assert that the patent is invalid, and counterclaim for attorney fees incurred to prove invalidity. The issue of patent validity was tried separately before this court on September 7 through 22, 1983. This constitutes this court's findings of fact and conclusion of law as to the issue of patent validity.

## INTRODUCTION

The central Georgia area contains some of the world's large deposits of kaolin, a type of clay predominantly comprised of the mineral kaolinite. In the paper making industry kaolin is used as a pigment to impart a bright white color and opacifying properties to the pulp fibers which make up finished paper. Prior to the use of kaolin, synthetic titanium dioxide ($TiO_2$) was the chief pigment used by the paper industry. Beginning in the 1950's and continuing throughout the 1970's, the price of $TiO_2$ escalated to levels which created a commercial need for an extender or substitute pigment. During this period the major kaolin companies expended considerable resources in an effort to develop a competitive pigment produced from their abundant supplies of kaolin. Since the paper industry was very satisfied with the performance of $TiO_2$, the production of a kaolin pigment which could match this performance, but at a lower cost, became the goal of all of the parties herein.

There are four physical properties (two of primary importance and two of secondary importance) which the market demands of a paper pigment:

*Properties of Primary Importance*

1. *High Brightness:* A pigment must be substantially white and very bright, *i.e.*, light reflective.[1]

2. *Low Abrasion:* The pigment must be of the lowest possible abrasion so as to minimize Fourdrinier wire wear during the paper forming process.[2]

---

1. The brightness of a pigment is measured by the degree (expressed as a percentage) to which it will reflect light as compared to a standard value. In the kaolin and paper industries, the standard measuring device is a brightness meter manufactured by the General Electric Company. A "substantially white" pigment is one that has a "GE brightness" value of 90% or more.

2. Abrasion is measured by an instrument manufactured by the Valley Iron Works Company.

*Properties of Secondary Importance*

3. *Relatively High Oil Absorption:* A relatively high [3] oil absorption quality is desirable so as to minimize ink strike-through onto the reverse of a printed page.[4]

4. *Relatively Low Surface Area:* The surface area of the individual clay particles comprising the pigment should be as small as possible, as the larger the particles the more difficult it is to bond the pigment to the paper.[5]

The key to the development of a successful kaolin pigment was to achieve both high brightness and low abrasion. However, under the prior art, the process used to increase brightness also increased abrasion. The prior art, such as the "Proctor" patent (Plaintiff's Exhibit 515), teaches that the smaller the average particle size of the pigment, the lower the abrasion value. It was well known that kaolin crude had to be reduced to the smallest particle size economically feasible in order to achieve low abrasion. Brightness is achieved by "calcining" these finely divided kaolin particles.

Calcination involves heating the kaolin particles to such extreme temperatures that all water is eliminated and the internal crystalline structure is virtually destroyed. In order to produce brightness competitive with $TiO_2$ (GE brightness above 90), the required calcination temperature had the deleterious effect of fusing the finely divided particles together into larger and thus more abrasive aggregates. The abrasion values of kaolin calcined at a sufficient temperature to produce a GE brightness of 90 plus were so high that the paper industry generally chose to incur the higher cost of $TiO_2$ rather than the even higher cost of more frequent Fourdrinier wire replacement. Conversely, a reduction of calcination temperature, while reducing abrasion, also reduced brightness to unacceptable levels of below 90 GE. Before the product derived from the patent in suit, none of the parties herein had produced a kaolin pigment that could genuinely compete with $TiO_2$.

The plaintiff contends that two distinct types of kaolin deposits exist within the middle Georgia area. According to the

Basically, a wire cloth of a pre-determined weight is subjected to a frictional force (caused by repetitious strokes of a weighted block upon the wire surface) in a medium comprised of a liquid slurry containing a fixed percentage of the clay product being tested. Upon completion of the test the wire cloth is removed, dried, and re-weighed. The abrasion value of the product is expressed in milligram weight loss to the wire.

Two variations of this procedure are employed in the industry. The Institute of Paper Chemistry's Procedure 65 calls for a specific percentage of clay solids within the slurry and a specific number of cycles in which the weighted block is rubbed on the wire cloth. William Proctor, in U.S. Patent No. 3,014,836, describes an alternative test. Although the Proctor method utilizes the same Valley Iron Works equipment, the procedure is modified by both increasing the solids percentage and by increasing the number of cycles in which the weighted block travels over the wire. Obviously, the wire loss sustained under the Proctor method is greater than that of I.P.C. Procedure 65.

3. The term "relative" is used so as to distinguish paper pigments from kaolin pigments used in the paint industry. Pigments used in oil-based paints must have low oil absorption values.

4. Oil absorption is measured by a method known as the "ASTM (American Society for Testing Materials) spatula rub-out" procedure. Under this method, 100 grams of the pigment is subjected to drops of linseed oil from a previously weighed vial. The oil is manually rubbed into the pigment with a spatula. Oil is added until a point is reached when the pigment can no longer absorb oil (as determined by visual appearance and texture). At this point the vial of oil is re-weighed, and the pigment's oil absorption rate is expressed as the grams of oil absorbed per 100 grams of pigment; *e.g.,* 60g/100g means 60 grams of oil was absorbed by 100 grams of pigment when saturation was achieved. The test is highly subjective due to the discretion of the operator as to when the saturation point is reached, as well as the degree of effort employed in application.

5. Surface area is measured by the BET test, which involves a measurement of the amount of gas that is required by form a surface layer on the test sample. A surface area range of 10 to $20 m^2/g$ means the product has an aggregate surface area in the range of 10 square meters to 20 square meters per gram of product.

plaintiff, one type of kaolin is known as "soft" clay, and is characterized by a cream color, relatively soft to the touch (capable of being crumbled in the hand), and made up of particles which have an average size of one micron or more. The plaintiff labels the other category as "gray" or "hard" kaolin, characterized by a darker gray color, relative hardness (crumbles with difficulty in the hand), and being made up of particles of an average size of ½ micron or less. The plaintiff maintains that, prior to its experiments which resulted in the patent in suit, the kaolin industry had rejected gray or hard kaolin as a possible source for a paper pigment, apparently due to its darker color.

In the mid-1960s, at least three employees of the plaintiff corporation conducted calcination experiments on hard kaolin obtained from plaintiff's Prim mine. To their purported surprise, when known processing methods were applied to hard kaolin a very bright product resulted. Since the average particle size of this hard clay was much smaller than that of soft kaolin, two very important results were obtained. First, the extreme fineness of the particles resulted in a calcined product of very low abrasion. Second, since this very fine particle size occurred naturally, fewer processing steps were necessary prior to calcination, and the end product was thus comparatively inexpensive to produce.

Claiming that the use of this previously ignored hard kaolin was a novel invention, the plaintiff acquired the subject patent on the pigment produced therefrom. This pigment, commercially known as Ansilex, has by all standards become an overwhelming commercial success. Ansilex has become widely used as either an extender of $TiO_2$ or as a complete pigment in and of itself. For many years it completely dominated the market and rendered defendants' high grade products made from soft clay virtually unmarketable. In response to Ansilex, the defendants began a determined effort to acquire deposits geologically similar to plaintiff's Prim mine. Having done so, they commenced production of products comparable to Ansilex; plaintiff claims these products infringe the patent in suit. Very recently, the defendants have acquired the technology to produce a pigment comparable to Ansilex solely from soft kaolin at a cost which allows them to compete.

The defendants have joined in a concerted attack upon the validity of the patent in suit. They raise five arguments in support of their position: (1) the patent is invalid due to indefiniteness in distinguishing between hard and soft clay (as well as the criticality of hard clay in general) and the proper measure of abrasion; (2) the Ansilex product was anticipated by a prior art, soft clay product manufactured by defendant Georgia Kaolin and sold under the name Altowhite; (3) use of hard clay was obvious to one skilled in the art since it was well known that ultrafine calciner feed produced a desirable product; (4) the plaintiff secured the patent through inequitable conduct; and (5) the true inventor of Ansilex was omitted from the patent application.

After a two week trial on the issue of validity, the introduction of hundreds of pages of exhibits, the submission of extensive deposition testimony, and thorough briefing by thirteen attorneys of record, the issue of patent validity is now ripe for decision.

## FINDINGS OF FACT

### I. INDEFINITENESS

#### A. *Hard v. Soft Kaolin*

■ The novelty of the invention described in the patent in suit is clearly premised on the use of hard or gray clay. Hard clay is mentioned over 50 times in the patent, and the unexpected success of this clay as a paper pigment is central to plaintiff's claim of uniqueness. The patent defines hard clay by comparison of its average particle size with that of soft clay. The patent claims that hard clay crude is comprised of ultimate particles 60% of which are less than ½ micron in size, with the post-calcination product having 50% of its particles finer than one micron. Plaintiff's exhibit 500, column 4, line 5; column 10,

line 55. Anglo-American Exhibit 249, a sample of what plaintiff claims is a hard kaolin, is visibly distinguishable from Anglo-American Exhibit 250, a sample labeled soft kaolin, both in color and texture.

The defendants contend that the terms "hard," "soft" and "gray" have no generally accepted meaning in the kaolin industry. They claim that any given deposit of clay contains ultimate particles both smaller than ½ micron and larger than 2 microns. They claim that each deposit differs in some respect with every other deposit, and that it is impossible to categorize every deposit currently owned as either hard or soft. Defendant Georgia Kaolin points out that its Mine Number 23 has an average particle size of .7 microns, which does not fit within plaintiff's purported definition of either hard or soft clay. The defendants argue that the patent is thus indefinite as to what type of clay is claimed as protected, and is therefore invalid.

The patent itself relies upon Grim, *Applied Clay Mineralogy* (1962), as authority for the distinction between hard and soft kaolin. Like the patent, Grim's key definitional distinction is average particle size. Grim defines hard kaolin as having an average particle size of less than ½ micron, while soft kaolin has an average particle size of at least one micron. *Id.* at 394–98. Written at a time prior to plaintiff's efforts, Grim's text recognized that hard kaolin was not used by the paper industry due to its lack of brightness in its uncalcined, natural state. *Id.* at 382. Use of hard kaolin had previously been limited to the rubber industry, where it was used to harden rubber (hence a suggested source of the term "hard"). The Grim text demonstrates a recognition of the distinction between hard and soft clay at least as early as 1962.

At trial the plaintiff called Dr. Vernon Hurst, a research professor at the University of Georgia, to testify as to the geological distinctions between hard and soft clay. Dr. Hurst testified that hard clay is sedimentary in origin, and was formed during the Tertiary era. Hard clay formed in a marine environment as very fine particles settled in layers. Lack of oxygen precluded large crystal growth. Dr. Hurst demonstrated this occurrence with electron microscope photographs which show hard kaolin as consisting of "stacks" or layers of face to face particles. Soft kaolin, on the other hand, was formed in the Cretaceous era as a result of in situ. weathering. The crystals were able to grow randomly, and these random intergrowths resulted in larger aggregates than those of hard clay. As a result of this difference in origin, the average particle size of soft kaolin is larger than that of hard clay. While it is true that both clays contain both ultrafine (less than ½ micron) and coarse (larger than 2 microns) particles, it is the difference in *average* particle size that distinguishes the two types of clay. See Plaintiff's Exhibit 665. While certain deposits may fall within the "gap" created by the Grim definition (Albert Deposition, Vol. 2 at 84–85; Haden Deposition at 235), the patent has chosen a more limited definition of 60% finer than ½ micron crude, and that is the definition which must govern its claim.

The defendants' claim that they cannot recognize a distinction between hard and soft clay is rejected for two reasons. First, in addition to the Grim text and Dr. Hurst's geological explanation, numerous exhibits offered by the plaintiff demonstrate that the kaolin industry itself has long been familiar with the distinction. See Plaintiff's Exhibits 189, 264, 519B, 519C, 523 and 524. Second, and most telling, both defendants Anglo-American and Freeport, after examining the patent upon the success of Ansilex, set out on a deliberate quest to acquire deposits of hard clay. See McKenzie Deposition at 39–46, 53–59 and Sennett Deposition Vol. I at 117–18 (Freeport); Spry Deposition at 128, 143, 151–52 (Anglo-American). See also Plaintiff's Exhibits 189 at 303299, 91, 31; Freeport Exhibit 1243. Freeport's geologist, for example, certainly understands the difference between hard and soft clay. Austin Deposition at 329–38; 341–42. The fact that defendants made an intentional decision to acquire hard clay deposits after analyzing Ansilex clearly demonstrates that defend-

ants know what hard clay is; the patent is not indefinite in this regard.

## B. *The Criticality of Hard Clay*

The defendants argue that since they are presently able to produce a pigment equivalent to Ansilex entirely from soft kaolin, the patent's emphasis upon hard clay is not critical to the invention and the patent is thus overbroad in scope. The plaintiff argues that defendants' present capabilities, first derived several years after the patent in suit issued, are irrelevant to the issue of patent validity.

It is now apparent that a pigment equivalent to Ansilex can be made from either hard or soft clay, or a blend of both, provided the beginning crude is sufficiently processed so as to result in a calcine feed which has an average particle size of ½ micron or less. The practical difference between the nature of the starting crude is the difficulty in separating these ultrafine particles and the amount of remaining crude rejected due to size. Since soft kaolin has a substantially larger average particle size as compared to hard kaolin, the process used to remove the small percentage of ultrafines is more involved than is the case with hard clay, and more of the initial crude is rejected.

At the time the patent in suit issued, it was theoretically possible to isolate soft kaolin particles of less than 1 micron in size. However, the only production scale method of achieving this result was sedimentation over time in a liquid medium. Testimony revealed that it would take as much as 100 hours or more of sedimentation in order for the thin top layer of ultrafine particles to be segregated from the bulk of larger particles. Of course, this process was relatively expensive. Thus, while it was possible to isolate soft kaolin particles of sufficient fineness to produce an Ansilex equivalent, it was not economically feasible to do so. See the discussion of Altowhite in the Anticipation section of this opinion, *infra*.

Several years after the patent in suit issued a new method, allowing for a quick and efficient separation of ultrafine soft kaolin particles, was developed. The device, known as a DeLaval Centrifuge, utilizes the principle of centrifugal force to achieve the same result as sedimentation but at a much faster rate, and at production scale. These centrifuges became available for production scale use in 1977. Tr. Vol. VI at 88–90. However, during the mid-1960s when the invention of the patent in suit was being developed, centrifuges were used only in the laboratory, and were not available for large scale production use. Tr. Vol. VIII at 61–63. With the advent of these new centrifuges it is indeed possible to make an Ansilex equivalent entirely from soft kaolin, and at a competitive price. However, prior to 1971, the year the patent in suit issued, existing technology did not allow for an economical method of producing such a pigment from soft kaolin; the cost of processing soft kaolin so as to isolate the required ultrafine particles was too high.

A trial court may admit post-patent discoveries to determine if an element of the patent is in fact critical to success. *Helene Curtis Indus. v. Sales Affiliates, et al.*, 233 F.2d 148, 154–155 (2d Cir.1956). The court is not bound to attach any particular weight to such evidence. Under the facts of this case, this court concludes that defendants' post-patent developments in technology do not invalidate the patent in suit, as such technology was unavailable at the time of the invention.

## C. *The Proper Measure of Abrasion*

As noted, the standard industry measure of abrasion is the Institute of Paper Chemistry's Procedure 65, the "Valley abrasion" test. The patent in suit purports to have used this method in arriving at the stated abrasion values. Plaintiff's Exhibit 500 at column 5, lines 56 and 72. However, a footnote reference at column 5, line 72 indicates that the Valley abrasion test used was that test described in U.S. Patent 3,014,836 to Proctor. The Proctor patent (Plaintiff's Exhibit 515) in fact describes a modification of the I.P.C. Procedure 65. In

fact, the abrasion values under Proctor's method are approximately twice that of I.P.C. Procedure 65.

The defendants argue that the patent in suit's textual reference to the "well-known Valley abrasion test method" is ambiguous given the footnote reference to Proctor. The defendants argue that the patent's claim of "Valley abrasion value below 50 mg." could mean either 50 mg. under I.P.C. Procedure 65 if that was the test intended, or 25 mg. under I.P.C. Procedure 65 if the Proctor method was actually claimed. This indefinite measure of abrasion renders the patent invalid, the defendants argue, as they do not understand the limits of the claim.

The plaintiff conceded at trial that the footnote reference to Proctor creates an ambiguity. Plaintiff contends, however, that the intended measure was the I.P.C. Procedure 65 test, that everyone skilled in the art understands that this was the test employed, and that the ambiguity was not intentionally created.

■ If the confusion created by the footnote was likely to be reasonably held, this court would have difficulty determining its effect on patent validity. However, it is clear that no one skilled in the art truly believed that the Proctor method had been employed. An I.P.C. Procedure 65 abrasion value never exceeding 25 mg. (the result had the Proctor variation actually been intended) would have been incredible, as no calcined pigment had ever been created which could achieve this result. Those skilled in the art testified at trial that they always knew the value claimed was that of I.P.C. Procedure 65, as it would have been absurd to conclude that an abrasion value of 10–20 mg. was possible in a calcined clay. Tr.Vol. IV at 6; Vol. V at 11. Since no *actual* confusion or ambiguity was created, the mistaken footnote reference does not render the patent invalid.

## II. ANTICIPATION

The defendants contend that a Georgia Kaolin product manufactured in 1963, commercially known as Altowhite, anticipated Ansilex in every claim. The evidence demonstrates that Altowhite samples varied widely in their relative properties. Plaintiff's Exhibit 717. However, Georgia Kaolin Exhibits 151 and 196 suggest that a "lot 20" of Altowhite did meet all of the claims of the patent in suit. Anglo-American Exhibit 255, which purports to be Altowhite but is somewhat lacking in authenticity, was analyzed and found to be within the claims of Ansilex. See Anglo-American Exhibits 171, 172 and 174. A 1964 report from the Institute of Paper Chemistry found Altowhite to be an acceptable extender for $TiO_2$. Georgia Kaolin Exhibit 5. Abrasion values for Altowhite samples intended for the paper industry ranged from 22 mg. (Anglo-American Exhibit 118) to 61.6 mg. (Dacey Deposition at 119–20).

Altowhite, however, was never a commercial success in the paper industry. When Altowhite was first marketed in 1963, it sold for $200 per ton, whereas Ansilex, when first marketed in 1970, sold for $80 per ton. Anglo-American Exhibit 256. This relatively high price of Altowhite was attributable to the complexity of the processing steps necessary to achieve the ultrafine particle size required for low abrasion. Fanselow Deposition, Vol. VII at 26. Altowhite was tested as a paper pigment by the Manadnock Paper Company in 1964. It was rejected in part due to its high price, Tr. Vol. V at 132, caused by the numerous processing steps required for production. Tr. Vol. VIII at 173. It was never again used as a paper pigment, but was sold to the paint industry, where abrasion is of minimal importance. When defendant Georgia Kaolin decided to produce an Ansilex equivalent, it did not revive production of Altowhite, but instead built a new plant and began calcination of hard kaolin. Tr. Vol. V at 172–74.

■ It is true that a product need not be a commercial success to qualify as anticipating prior art. *Dunlop Co., Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973). But it is also true that the substitution of a non-obvious material which not

only results in unexpected success, but does so at decided savings in cost, is patentable even though its claims have been met in the prior art. 2 *Deller's Walker on Patents* § 112 at 247–48 (2d ed. 1964) (cases cited therein). Since the use of hard clay was not obvious (see Obviousness section, *infra*), the fact that Ansilex is produced at a cost overwhelmingly cheaper than that of Altowhite distinguishes Ansilex from the prior art. In other words, even if it is assumed that Altowhite met the claims of the patent in suit, the fact that Ansilex is produced from a different, non-obvious crude at a decided savings in cost renders Ansilex unanticipated by Altowhite.

## III. OBVIOUSNESS

Prior to the development of Ansilex it was well known that abrasion values were directly related to the size of the kaolin particles subjected to calcination—the smaller the particle size, the lower the abrasion. Various processing steps were employed to "delaminate," or break apart, soft kaolin aggregates so as to reduce average particle sizes. It was also known that hard clay was comprised of particles smaller in average size than those of soft clay; hard clay had been labeled "naturally delaminated." Albert Deposition, Vol. I at 19. The defendants argue that this pre-patent knowledge of the industry rendered the invention at issue obvious and thus unpatentable.

Prior to Ansilex, only the plaintiff had experimented with the use of hard clay as a paper pigment. Plaintiff had developed an uncalcined pigment known as Ultragloss 90. Anglo-American Exhibit 105. All of the other kaolin companies, despite their knowledge of hard clay's fine particle size, had rejected hard clay as a possible crude for a paper pigment. Those skilled in the art, such as defendant Freeport's geologist, Dr. Austin, had always assumed that due to its dark color hard clay would not produce an acceptable product. Austin Deposition at 301–14. See also Stebbins Deposition at 29–35. John Fanselow (one of the named inventors in the patent in suit), stated that during his 30 years of experience in paper technology it had never occurred to him that hard clay could be used as a paper pigment, primarily due to its "low levels of brightness." Fanselow Deposition, Vol. III at 18–23. Anglo-American's patent attorney searched 27 kaolin patents and conceded that none suggest the result of calcining hard clay. Klauber Deposition at 231–34; 269–70.

The plaintiff itself did not have any reason to expect the results which occurred upon calcination of hard clay. The plaintiff was in possession of large deposits of hard clay and was searching for some way to use them. Allegrini Deposition Vol. II at 149–50. Fanselow described his experiments as a "shot in the dark," made in "desperation," and the results were a total "surprise." Fanselow Deposition Vol. I at 74, 114; Vol. II at 114–16; Vol. IV at 46; Vol. V at 33–34; Vol. VIII at 24–27. Daniel Jacobs, the co-inventor of Ansilex, agreed that the results of their experiments were an unexpected surprise. Jacobs Deposition at 21, 27–28, 348.

Perhaps the most revealing insight into the defendants' true understanding of the utility of hard clay is found in a report to the management of defendant Anglo-American Clays authored by Robert Lehman, who was commissioned to investigate and report on Anglo's possible response to the impact of Ansilex on the market. Mr. Lehman reported:

> Ansilex almost perfectly meets the 'dream' of the paper industry for a finely-divided calcined clay with LOW ABRASION.
>
> \*     \*     \*     \*     \*     \*
>
> ANSILEX IS A UNIQUE PRODUCT
>
> \*     \*     \*     \*     \*     \*
>
> ANSILEX IS THE RESULT OF A TECHNOLOGICAL BREAKTHROUGH
>
> \*     \*     \*     \*     \*     \*
>
> Ansilex is produced from what would have been considered an OFF–GRADE WORTHLESS CRUDE before 1970.

**444**

Plaintiff's Exhibit 44 (emphasis in original). In referring to hard clay as an off-grade, worthless crude, it is at once apparent that the use of hard clay as a paper pigment was anything but obvious.

Finally, the commercial success of Ansilex and the efforts of the defendants to copy it are also relevant to the issue of obviousness. Sales of Ansilex have exceeded $100 million dollars. The Lehman Report, Plaintiff's Exhibit 44, *supra*, clearly demonstrates the defendants' intent to make a "Japanese copy" of Ansilex, with such intent being evidenced by defendants' post-patent actions in rushing to secure tracts containing hard clay deposits. See Indefiniteness section, *supra*. In light of all of these circumstances, this court must reject defendants' assertions and find that the utility of hard clay as a crude for paper pigments was not obvious at the time the patent in suit issued.

## IV. INEQUITABLE CONDUCT

The defendants allege that plaintiff's conduct in prosecuting the application which resulted in the patent in suit fell far short of good faith and total candor, and that the patent must therefore be declared invalid. The defendants cite the plaintiff's failure to disclose Altowhite and other soft kaolin pigments as prior art, the inclusion of inaccurate ink strike-through reduction test results, and the fact that Ansilex is not used as a filler for newsprint contrary to the patent's claims.

The defendants strongly contend that Altowhite, since it arguably met all of Ansilex's claims, should have been disclosed to the patent examiner. The plaintiff takes the position that since Altowhite and the other products claimed omitted were all derived from soft kaolin, they were not relevant prior art as to the plaintiff's claim on hard clay, and thus no disclosure was required. It certainly would have been better to have revealed all of the then

existing known kaolin pigments to the Patent Office and then demonstrate why the invention claimed was unique. But plaintiff's failure to do so does not demand a finding of invalidity absent some proof that undisclosed prior art would render the patent's claims less novel. As noted, Ansilex was not anticipated by Altowhite due to the decided savings in cost resulting from the use of a non-obvious crude which produced unexpected results. Since disclosure of Altowhite and the other soft kaolin pigments asserted would not have diminished the uniqueness of the patent's claims, their omission does not require an invalidation of the patent.[6]

Defendant Anglo-American points out that the ink strike-through reduction values claimed in the patent are inaccurate and overrate Ansilex's performance. Anglo-American Exhibit 8. The patent also understates the effectiveness of a soft kaolin pigment, Hi Opaque, in reduction of ink strike-through. Anglo-American Exhibits 61, 62. While the court acknowledges the existence of these inaccuracies, no finding of invalidity is compelled. The inaccuracies have not been shown to have been intentionally submitted in order to cure a rejection on prior art grounds. *Cf. Rohm and Haas Co. v. Crystal Chemical Co., et al.,* 722 F.2d 1556, 1570 (Fed.Cir.1983). Further, reduction of ink strike-through is not a critical property in high quality, relatively thick paper stock, the chief application of Ansilex. Dacey Deposition at 20, 30. Since these inaccuracies do not materially alter the novelty of hard clay as a paper pigment, a finding of invalidity is not mandated.

Finally, the fact that Ansilex is not widely used as a newsprint filler is a result of market demand, not misrepresentation. As the Lehman Report, Plaintiff's Exhibit 44, observed, Ansilex was grossly mismarketed in its early years. The plaintiff underestimated the superior performance of An-

6. The omission of Altowhite is certainly the defendants' strongest contention since it arguably met all of Ansilex's claims. But, the fact that the properties of Altowhite varied so widely among samples militates against a finding of inequitable conduct. See Plaintiff's Exhibits 717, 417.

silex in higher quality paper. The fact that Ansilex is now used in the more lucrative market of higher quality paper is the result of Ansilex's superior properties, not fraud. Ansilex certainly can be used as newsprint, catalog or directory paper filler. Plaintiff's Exhibit 571. The fact that it can command a higher price elsewhere does not affect patent validity.

## V. DISCLOSURE OF THE "BEST MODE"

The patent states that the product claimed therein can be achieved by calcining hard clay at temperatures in the range of 2200 to 2300 degrees Fahrenheit. Plaintiff's Exhibit 500, column 6, line 65. In fact, plaintiff knew that the optimum temperature was 2000 to 2050 degrees Fahrenheit, and that calcination above 2100 degrees would result in unacceptable fusion of particles into abrasive aggregates. Fanselow Deposition Vol. II at 162–63; Puskar Deposition Vol. II at 139. Most disturbingly, the patent attorney employed by plaintiff to submit the patent application was aware of this inaccuracy, and specifically advised plaintiff's management that "[w]e did not disclose specific optimum temp." Anglo-American Exhibit 197. Defendants argue that this failure to set forth the best mode to achieve the product claimed by the patent violates 35 U.S.C. § 112, and renders the patent invalid, citing *Engelhard Industries, Inc. v. Sel-Rex Corp.*, 253 F.Supp. 832 (D.N.J.1966).

■■■ Because of variations among calciners and the different processing steps involved, it is well known in the industry that experimentation in temperature is necessary so as to find the optimum range for each manufacturer's equipment and method of operation. By experimenting with various calcining temperatures, defendant Anglo-American was able to produce an Ansilex equivalent. Plaintiff's Exhibit 631. Thus, it is apparent that the language of the patent in suit does not prevent reproduction. In this regard 35 U.S.C. § 112 has been satisfied. The court is troubled by the plaintiff's apparent intentional withholding of optimum temperature. Were it not for the fact that calciners vary widely in design and thus require temperature experimentation in any event, this conduct on the part of plaintiff might prove fatal to patent validity, as was the case due to plaintiff's conduct in the *Sel-Rex* case. However, because temperature experimentation would be required even if the ideal range had been disclosed, and in light of the fact that defendants discovered the method to produce an Ansilex equivalent in their own plants, this court is unable to find plaintiff's conduct so culpable as to warrant a finding of invalidity.

## VI. INVENTORSHIP

Defendants contend that one Victor Puskar was the true inventor of Ansilex as he was the first individual to calcine hard kaolin, and that the omission of his name from the patent application renders the patent invalid under 35 U.S.C. § 102(f).

It is true that Victor Puskar performed the actual calcination experiments on hard clay. But Puskar acted at the direction of Fanselow. Puskar knew nothing about the application of kaolin to paper. He acted as Fanselow's and Jacob's "pair of hands" in the laboratory. Tr. Vol. II at 109–110. Once the calcined particles left Puskar's laboratory, he had no idea as to what became of them by those in the paper laboratory. Allegrini Deposition at 157–58.

■■■ A person who merely follows the instructions of another in performing experiments is not an inventor. *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1385 (W.D.La.1980), *aff'd*, 667 F.2d 1232 (5th Cir.1982). The inventive thought resided in Fanselow and Jacobs, not Puskar. The court finds no violation of 35 U.S.C. § 102(f).

## CONCLUSIONS OF LAW ON PATENT VALIDITY

The court has found that hard clay is adequately defined by the patent in suit, that the use of hard clay as a starting crude for a paper pigment was not obvious,

and that the product claimed by the patent was not anticipated by Altowhite. The court also notes, however, that hard clay was not processed in any new or different manner, but that it was simply subjected to known processes to achieve the claimed result. The issue, therefore, is whether the substitution of one element for another into a known process can result in a patentable invention.

The general rule has been stated in numerous cases: "the substitution of a superior material for an inferior one in a known device is not invention even though the new material more satisfactorily serves or performs the intended function of the old." *AMP, Inc. v. Burndy Corp.*, 332 F.2d 236, 239 (3rd Cir.), *cert. denied*, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964). *See also Centsable Products, Inc. v. Lemelson*, 591 F.2d 400, 403 (7th Cir.1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *Haloro, Inc. v. Owens-Fiberglas Corp.*, 288 F.2d 148, 149 (D.C. Cir.1961); *Continental Can Co. v. Anchor Hocking Glass Corp.*, 362 F.2d 123, 127 (7th Cir.1966); *A.E. Staley Mfg. Co. v. Old Rock Distilling Co.*, 223 F.Supp. 798, 802 (W.D.Mo.1963). *See generally* 2 *Deller's Walker on Patents* § 112 (2d ed. 1964). However, this general rule is based on the assumption that the material substituted performs in a *well known* or *expected* manner. *See Houston v. Polymer Corp.*, 200 U.S.P.Q. 26, 29 (N.D.Cal.1978) (defendants' decision to substitute nylon for steel as a wear surface in pedestal liners was inspired not by creative invention but by its knowledge of the long-established properties, *e.g.*, impact strength and resilience, of nylon). *See also Leach v. Badger Northland, Inc., et al.*, 385 F.2d 193, 196 (7th Cir.1967); *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 267 (2d Cir.1967); *Rosenberg v. Standard Food Products Corp.*, 331 F.Supp. 1065, 1068 (E.D.N.Y.1971), *aff'd* 456 F.2d 1335 (2d Cir.1972); *Ballas Liquidating Co. v. Allied Indus. of Kansas, Inc.*, 205 U.S. P.Q. 331, 349 (D.Kan.1979). Where the excellence of the material substituted was not previously known by those skilled in the art, the substitution was not obvious and produced startling and unexpected results, and a more efficient or cost-productive result is obtained, a patentable invention can be sustained. *Harloro, Inc. v. Owens-Corning Fiberglas*, 288 F.2d at 149; *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 190 U.S.P.Q. 455, 459 (9th Cir.1976); *cf. United States v. Adams*, 383 U.S. 39, 51–52, 86 S.Ct. 708, 714–15, 15 L.Ed.2d 572, 580 (1966). *See generally* 2 *Deller's Walker on Patents* § 112 at 247–48 (2d ed. 1964).

Based upon the foregoing principles of law, this court concludes that the claims of the patent in suit are valid as a genuine invention. Certainly, hard clay was well known to those skilled in the art, and it was merely substituted for soft clay in a known process. However, no one in the industry would have expected the results obtained. Everyone assumed that hard clay would not produce a bright pigment due to its dark color. As Mr. Lehman reported, it was considered an "off-grade[,] worthless crude." Plaintiff's Exhibit 44. The inventors all testified that they were startled by the product resulting from calcining hard clay. The defendants' understanding of the utility of hard clay is best evidenced by their conduct—they rushed to acquire hard clay deposits *after* the success of Ansilex was established. This case clearly falls into the exception to the "substitution" cases, as set forth in *Haloro* and similar cases cited above.

THEREFORE, it is the opinion of this court that U.S. Patent Number 3,586,523 is in all respects VALID under the laws of these United States.

APPENDIX

# United States Patent Office

Patented June 22, 1971

3,586,523
CALCINED KAOLIN CLAY PIGMENT
John R. Fanselow, Plainfield, and Daniel A. Jacobs, Metuchen, N.J., assignors to Engelhard Minerals & Chemicals Corporation, Township of Woodbridge, N.J.
No Drawing. Filed Jan. 15, 1968, Ser. No. 697,581
Int. Cl. C08h 17/06; C09c 1/42
U.S. Cl. 106—288B                    2 Claims

## ABSTRACT OF THE DISCLOSURE

A finely divided, substantially anhydrous amorphous aluminum silicate obtained by calcining a specific type of kaolin clay, namely hard sedimentary kaolin clay, is used as a functional filler for newsprint or similar lightweight printed paper that is printed with low viscosity ink to reduce ink strike-through and to increase sheet brightness and opacity.

## BACKGROUND OF THE INVENTION

It is the practice of the paper industry to fill certain paper, such as magazine stock, with substantial quantities of mineral matter such as refined kaolin clay. This is done to increase the opacity and brightness and the paper. Fillers also improve the printability of the sheet by increasing the smoothness, levelness and ink receptivity.

The manufacture of newsprint, however, differs substantially from the manufacture of magazine paper. In manufacturing newsprint, economic considerations rule out the use of certain materials that are normally employed in making magazine paper. Thus newsprint is made from inexpensive fiber and the large quantities of fillers used with other papers cannot be employed on a practical basis. Also, the paper is printed with low viscosity inks that are substantially different from the inks used in printing the more expensive papers.

As a result of these and other factors, the manufacture of newsprint or similar lightweight paper that is printed with low viscosity ink presents unique problems, one of the most significant of which is so-called "strike-through" or "show-through." This is a phenomenon whereby the printed matter applied to one face of the printed sheet is visible on the reverse side. Generally, it results from the fact that the vehicle of low viscosity inks has a tendency to penetrate or "strike-through" the sheet. This results in the formation of translucent areas in the sheet, reducing opacity, and causing the printing to be visible from the reverse side. The problem is especially severe when sufficient ink is employed to obtain a dark, distinct registration.

To reduce ink strike-through, some newsprint is filled with certain synthetic amorphous zeolites or synthetic hydrated silicas. The zeolites which are employed are obtained by precipitating oxides of sodium and aluminum in the presence of pre-precipitated silica. The zeolite and hydrated silica filler materials are considerably more expensive than mineral silicate fillers such as clay.

Calcined and uncalcined paper filling grades of kaolin clay of the type commonly used to load quality printing paper such as magazine stock are relatively ineffective in reducing ink strike-through in newsprint. Properties of typical filler grades of kaolin clay are described at page 383 of Grim's "Applied Clay Mineralogy," McGraw-Hill Book Company, Inc. (1962). Although kaolin fillers are very inexpensive as compared to the precipitated siliceous fillers, they have not been employed commercially as functional fillers for present-day newsprint or rotogravure sheets.

## PRIOR ART

U.S. 3,277,607, "Method of Adding Silica Pigments to Newsprint Pulp to Improve Ink Strike Properties of the Newsprint and Pigment Therefor," Mays et al., issued Jan. 4, 1966, describes a group of finely divided, highly oil absorptive, synthetic spherical siliceous pigments and the use of such pigments as functional fillers for newsprint. By way of comparison, the patent includes data on the results of filling newsprint with hexagonal kaolin particles. The data confirm our findings that the kaolin filler was comparatively ineffective with respect to reducing ink strike-through and improving sheet brightness as compared to the synthetic precipitated siliceous fillers.

## THE INVENTION

An object of the invention is to provide a novel inexpensive clay-derived aluminum silicate product adapted for use as a filler for newsprint or similar lightweight paper that is printed with low viscosity ink.

Another object is to provide filler loaded printed paper sheets with outstanding optical properties at low filler loadings.

This invention results from our discovery that a specific clay material, described hereinafter, is uniquely effective in decreasing ink strike-through and improving the sheet brightness and opacity of newsprint or similar lightweight paper. The novel processed clay material differs in kind from other clay products when present in small quantities in newsprint sheets or the like.

Stated briefly, the novel functional filler of the present invention is an amorphous, substantially anhydrous aluminum silicate obtained by calcining finely divided particles of a specific type of sedimentary kaolin clay, namely, hard clay. The novel functional filler may be incorporated with the fibers in the sheet before the sheet is printed with a low viscosity ink.

The resulting filled sheets are markedly improved with respect to brightness, opacity and reduction in ink strike-through as compared to unfilled sheets of similar fiber composition. The filled sheets are markedly superior to sheets filled with other kaolin products. Sheets filled with small quantities of calcined hard kaolin are generally comparable and sometimes superior to sheets which contain similar quantities of synthetic precipitated siliceous fillers. When employing calined hard kaolin, however, the desired improvement in the quality of the printed sheet is achieved at a fraction of the cost that is incurred when precipitated fillers are employed.

The type of clay which is processed to prepare the unique functional filler product of the invention is a form of kaolin heretofore used in raw (uncalcined) form as a filler by the rubber industry. The paper industry, in contrast, has utilized raw or calcined soft clays and has made limited use of hard clays. When employed by the paper industry and the rubber industry, however, the hard clays have been used in uncalcined form. To the best of our knowledge, hard kaolins have never been calcined heretofore to produce filler or pigment products.

As mentioned, one essential feature of the invention is that the hard kaolin clay must be calcined before it is employed as a functional filler for newsprint or the like. It has been found that uncalcined (raw) hard kaolin clay is not significantly different from conventional kaolin filler clays (coarse size fractions of uncalcined soft kaolin clay) with regard to reducing ink strike-through. Uncalcined hard clay is markedly inferior to calcined hard clay in increasing sheet brightness and opacity and in reducing ink strike-through. Both uncalcined hard clays and uncalcined soft clays are inferior to the commercially used zeolite and precipitated silica fillers in these respects.

Still another feature of the functional filler product of the invention is that it has been obtained by calcining hard kaolin clay while the clay is in the form of a finely divided powder. Calcination of massive aggregates or coarse lumps of the hard clay will not suffice.

The effectiveness of calcined hard kaolin as a functional filler for newsprint was surprising and unexpected for many reasons.

In the first place, the selection of a material for use as an agent to reduce ink-strike would logically be directed to the choice of a white pigment having high surface area and the capacity to absorb large quantities of oil since news inks are employed as oily suspensions. U.S. 3,227,607 (supra) specifically teaches that the combination of high oil absorptivity, small particle size and high surface area of a filler contribute to the desired printing properties in newsprint. Calcined hard kaolin, however, has a very low surface area and poor oil absorption properties as compared to the synthetic precipitated siliceous pigments which have been demonstrated to be highly effective as functional newsprint fillers. Further, the ultimate particles of calcined hard kaolin are significantly larger than the submicron-size particles of prior art precipitated newsprint fillers. Therefore, the intrinsic prop-

erties of calcined hard kaolin would not reasonably suggest to one skilled in the art that calcined hard kaolin would have a remarkable effect on ink strike-through.

Moreover, the exceptional effect of calcined hard kaolin on sheet brightness and the superiority to calcined soft kaolin was not predictable. Hard kaolin crudes are generally significantly less bright than soft kaolins. In fact, hard kaolins are frequently referred to as "gray kaolin" by the paper industry. The reason why hard kaolins have heretofore found limited use by the paper industry is that raw, uncalcined hard kaolin clay does not possess the required brightness. See the Grim text (supra) at page 382. Contrary to expectations, calcined gray kaolin improved the brightness of representative newsprint sheets to a significantly greater extent than did various calcined kaolins in spite of the fact that latter kaolins had higher brightness values than the calcined hard kaolin.

## DESCRIPTION OF THE INVENTION

Hard and soft kaolin clays are distinguished from each other in the Grim text (supra) at pages 394 to 398. Conventional papermaking kaolins are described in the same publication at pages 383 to 386. As mentioned in the Grim publication, hard kaolins are generally darker than soft kaolins, hard clays having brightness values of 71 to 78 percent and soft kaolins having brightness in the range of 74 to 82 percent. As noted above, hard kaolin clay is frequently referred to as "gray" clay since such clay normally has a distinct gray color.

Hard kaolin clays are also distinguished from soft kaolin clays by the fact that ultimate particles in hard kaolin clays are significantly finer than the particles in soft kaolins. The "ultimate" size is the size of the particles in a well-dispersed clay pulp. The fine size of the ultimate particles is responsible, at least in part, for the unusual mechanical strength of aggregates of raw hard clay, this giving rise to the term "hard" clay.

In a hard clay, substantially all (e.g., 90% by weight) of the particles are finer than 2 microns. See the Grim text (supra). About 60% by weight of the representative sample of hard kaolin described in the Grim text was finer than ½ micron. In other words, the average particle size of the hard clay was well below ½ micron. Soft kaolins, in contrast, contain a substantial amount of particles coarser than 2 microns. The plus 2 micron particles generally differ from the finer particles in that the former are composed of stacks or booklets of hexagonal clay crystals. The average particle size of a representative papermaking soft clay described by Grim was about 1 micron. Only a minor amount was finer than ½ micron.

Another difference is that hard kaolin clays tend to be less ordered (well crystallized) than soft kaolin clays. In other words, the soft kaolins produce more sharply defined X-ray diffraction peaks.

Still another difference between hard and soft clays, as shown in the Grim text, is that hard kaolin clay absorbs less water than soft kaolin clay.

Suitable hard kaolin clay crudes are sedimentary in origin. Such crudes are found, by way of example, in South Carolina and Georgia. The principal mineral constituent in the crudes is kaolinite, the particles of which are substantially all finer than 2 microns equivalent spherical diameter. Most hard crudes have a distinctly gray color.

In producing the calcined hard kaolin functional filler, the hard clay crude must be refined at least to the extent that coarse agglomerates and grit (plus 325 mesh residue) are removed. This may be done by wet or dry processing techniques. Dry processing of a clay crude is described by Grim at page 381. In wet processing, the clay is dispersed in water and degritted by means of screens or the like. Preferably, the wet-processed clay is hydraulically classified by sedimentation or centrifugation to remove virtually all particles larger than about 2 microns (equivalent spherical diameter).

The wet degritted slip of clay may undergo further refining such as flotation, as described for example in U.S. 2,990,958 to Greene et al., to remove colored titaniferous impurities from the clay. The hard clay may be chemically bleached with or without having undergone flotation beneficiation.

It is essential when calcining the clay to charge the calciner with dry, minus 200 mesh particles of the hard clay since calcination of coarse lumps of the clay or a clay filter cake will not provide products having the desired properties. Wet or dry processed clays must therefore be pulverized to minus 200 mesh or finer before being calcined. Wet processed clays must undergo a drying step before the calcination in order to permit puverization. This may be accomplished by spray drying a dispersed slip of the wet processed hard clay and pulverizing the spray dried microspheres. Ammonium hydroxide is a preferred dispersant when the clay is dried by spraying since such dispersant does not introduce salts which might flux the clap particles during the calcination.

A preferred method for calcining the clay is by continuous rotary calcination with a shielded flame, as described in Ser. No. 514,457, filed Dec. 17, 1965 by Allegrini et al., now U.S. 3,383,438.

It is also possible to calcine the clay in a multihearth furnace or in a muffle furnace.

During calcination, the temperature of the clay particles should be within the range of about 1600 to 2300° F. Residence time will vary considerably with the calcination equipment that is used but should be sufficient to dehydrate the clay substantially, completely without forming high temperature crystalline phases. During calcination the clay undergoes an abrupt endothermic reaction associated with loss of water of hydration. After the clay passes through the endotherm it undergoes an exothermic reaction at about 1800° F. We prefer to employ hard clay which has been calcined under conditions of temperature and time such that the clay undergoes the exotherm after dehydration has taken place. Such clay is brighter than clay calcined under moderate conditions and generally results in a brighter filled sheet. Calcined hard kaolin that has undergone the exotherm also is more effective in reducing ink strike-through than calcined hard kaolin that has not passed through the exotherm.

The calcined hard clay should have a volatile matter content below about 1% by weight. The term "volatile matter" refers to the weight percent of a material that is eliminated when the material is heated to essentially constant weight at 1800° F.

Since powdered kaolin clay tends to agglomerate into soft friable small balls during calcination, especially when the calcination is carried out in a rotary calciner, the calcined clay must be repulverized to minus 200 or 325 mesh (Tyler) before use as a newsprint filler. Thus, in producing the newsprint filler pigment, degritted hard clay must be pulverized, calcined and then repulverized.

Calcination effects many changes in the hard clay. Originally, the clay is a hydrated aluminum silicate having a volatile matter of about 13% to 14% by weight. The original clay is a crystalline material and an X-ray pattern of the material has a well-defined peak characteristic of the crystalline mineral. In contrast, the calcined clay is substantially anhydrous and it is amorphous in the sense that an X-ray diffraction pattern of the material does not contain well-defined peaks. As another difference, the ultimate particles of the calcined hard clay are coarser than the particles of the raw hard clay precursor. Thus, a hard clay which has an average size of about 0.3 micron before calcination may have an average size of about 0.8 micron after calcination.

Calcination also increased block brightness of the clay. A wet-processed flotation beneficiated, chemically bleached hard clay having a brightness of 89% to 91% before calcination may have a brightness of about 90% to 94% after calcination. All brightness values of minerals and fillers as used herein refer to block brightness values as

determined in accordance with the TAPPI procedure with a G.E. reflectance meter using light having a wavelength of about 457 mμ.

In spite of the fact that calcined hard kaolin has remarkable ink strike-through, opacifying and brightening properties, such material would be of limited practical use as a filler for newsprint or similar light-weight paper stock if the calcined clay were highly abrasive. A very abrasive calcined clay would result in excessive Fourdrinier wire-wear during the paper forming step. A unique characteristic of hard kaolins that was discovered in carrying out the experimental work that led to the development of the instant invention is that calcination of powdered hard clay may result in products of remarkably low abrasiveness. As measured by the well-known Valley abrasion test method, calcined powdered hard clays may have abrasion values below 50 mg. Calcination of powdered soft kaolin clays under comparable conditions produces much more abrasive products, e.g., products having Valley abrasion values above 100, usually above 300.

Following is a summary of typical physical properties of representative samples of calcined hard kaolin.

| | Product of invention |
|---|---|
| Oil absorption (ASTM) g./100 g. | 60–90. |
| Oil absorption (Gardner-Coleman) g./100 g. | 110–130. |
| ǂ 325 mesh residue, wt. percent | Less than 1. |
| Brightness, percent (TAPPI) | 92–95. |
| Valley abrasion [1], mg. | 20–50. |
| Surface area (B.E.T.), m.²/g. | 0.6–0.8. |
| Average particle size, e.s.d. | 10–20. |

[1] Test described in U.S. 3,014,836 to Proctor.

The calcined hard kaolin pigment may be used alone or in any desired proportion with other fillers, such as the zeolite or hydrated silica fillers of U.S. 3,227,607, or the specially processed attapulgite clay fillers described in Ser. No. 524,987 (filed Dec. 16, 1965) by Hecklau et al., now U.S. Pat. No. 3,433,704.

The calcined hard kaolin filler is employed in amount to provide a finished sheet containing about 1% to 10% filler based on the sheet weight, on a moisture-free (dry) filler weight. Moisture-free filler weight refers to the weight of the filler after being dried to essentially constant weight at about 220° F. The calcined hard clay is especially effective when used in about as low as about 2% of the dry paper weight.

The calcined hard kaolin is adapted to be used as a filler for low basic weight paper, i.e., paper having a weight of about 26 to 40 pounds per ream (24″ × 36″ = 500 sheets). Filled newsprint usually has a weight of about 32 pounds per ream. Newsprint finish usually contains at least about 60% ground wood pulp, most frequently about 60% to 85% ground wood, and the balance long fiber chemical pulp. The calcined hard clay is not limited in use to the filling of paper made up largely with ground wood pulp since it may be employed with long fiber pulp such as the pulp used to prepare bible paper.

In producing the filled paper, the pulverized hard clay may be incorporated with agitation into the wet paper furnish before the stock enters the headbox or while the stock is in the headbox. Alternatively, the paper may be filled with the calcined hard clay by the spraying technique suggested for use with synthetic precipitated siliceous newsprint fillers.

The low viscosity inks that are employed for printing the filled lightweight, porous papers include news inks and rotogravure inks. The vehicle of news inks consists almost exclusively of light-colored mineral oil. This type of ink dries by absorption of the vehicle. Rotogravure inks are prepared with a vehicle of a petroleum solvent and a resin binder. Gravure inks dry by evaporation of the solvent.

## EXAMPLE

### Preparation of calcined hard kaolin filler powder

A sample of hard gray kaolin from the Prim property near McIntyre Ga., was crushed, dispersed in water and degritted over a 325 mesh screen. The brightness of the minus 325 mesh clay was about 78%.

The degritted hard clay was fractionated to about 98% minus 2 microns, beneficiated by froth flotation and bleached by treatment with potassium permanganate and zinc hydrosulfite as described in U.S. 3,353,668 to James B. Duke.

The filter cake from the bleaching vats contained about 60% solids and was fluidized by adding a small amount of ammonium hydroxide. The dispersed slip was spray dried with an 1080° F. inlet temperature, a 225–265° F. outlet temperature and a 24,000 r.p.m. spray wheel speed. The spray dried product was pulverized in a micropulverizer through a 0.020″ screen. The pulverized clay was then calcined on a continuous basis in an indirectly fired rotary kiln as described in U.S. 3,383,438 to Allegrini et al. Inlet temperature of the gas in the kiln was within the range of about 2200° F. to 2300° F. Outlet temperatures were within the range of 1150°–1205° F. during the calcination. After the calcined hard kaolin was cooled, it was pulverized in a micropulverizer with a 0.02″ screen.

The calcined product had a loss on ignition (at 1800° F.) of 0.77% by weight and analyzed about 45% by weight $Al_2O_3$ and 53% $SiO_2$. Gardner-Coleman oil absorption value was 123 g. oil/100 g. ASTM oil absorption value was 76 g./100 g. Surface area (B.E.T.) was 15.2 m.²/g. The block brightness of the clay as determined with a G.E. meter by the TAPPI method was 93.5%.

The product had a plus 325 mesh residue of 0.42% by weight. A particle size distribution curve of the product was obtained from sedimentation data. From the sedimentation data, the particle size distribution was calculated by application of Stokes' law using 2.58 g./ml. as the apparent density for the clay. A particle size distribution curve was drawn. From the curve, it was estimated that the ultimate particles in the calcined hard clay were 100% by weight finer than 4.5 microns; 98% finer than 3.4 microns; 85% finer than 1.7 microns; 70% minus 1.3 microns; 50% minus 0.8 micron; 28% minus 0.57 micron; 10% minus 0.40 micron and 3% minus 0.28 micron.

Preparation of filled newsprint sheets

The calcined hard kaolin product was used to fill newsprint sheets. For purposes of comparison a variety of other kaolin products, including uncalcined and calcined kaolins, were used to fill similar handsheets. For further purposes of comparison, some newsprint sheets were prepared without any filler. Other sheets were prepared with commercially used precipitated siliceous fillers.

The fillers tested for purpose of comparison are as follows:

"Zeolex® 23P"—a precipitated, spherical, hydrated sodium aluminosilicate zeolite pigment; this pigment is used commercially as a filler for newsprint.

"Hi Sil® 404"—a functional, hydrated silica pigment.

Uncalcined hard clay—a sample of floated, bleached pulverized, spray-dried hard clay which was not calcined.

"Stellar"—uncalcined, fine fraction of bleached, Georgia soft kaolin clay having an average particle size of about 0.6 micron; commercially used as paper coating pigment.

"No-Karb"—uncalcined, coarse size fraction of bleached Georgia soft kaolin clay having an average particle size of about 5 microns; commercially used as a filler clay for magazine paper, etc.

"HT"—similar to Stellar but having an average size of about 0.8 micron.

All calcined clays were pulverized in a mill with a 0.02″ screen before and after calcination and were calcined under conditions similar to those described above in connection with the calcination treatment of the hard kaolin.

The pulp that was used to make news handsheets consisted of ⅔ ground wood fibers and ⅓ semibleached kraft pine fibers. The handsheets were made up with 2.50 ± 0.10 grams air dried pulp per sheet (37 lu./3000 sq. ft. ream). All the sheets were made from a master batch of fiber

which was refined to a Schopper-Riegler freeness of about 35. All handsheets were made using a Nobel & Wood laboratory handsheet machine and equipment. Test fillers were added in the form of aqueous dispersions of 12.5 percent weight concentration in amounts within the range of 1 to 10% of the dry sheet weight, calculated on an oven-dry filler weight basis. Following the addition of the slurry of filler, a 20% alum solution was added in amount of 4 cc. per sheet. The alum solution contained sulfuric acid in amount to provide a pH of 4.8 ± 0.2 per 10 liters of deionized water in the headbox. Sets of fifteen sheets each were prepared at each level of each mineral addition at the 37 lbs. basis weight level.

The handsheets were calendered on a supercalender with one pass at 500 lb. per linear inch, followed by a second pass at 1000 lb. per linear inch to simulate the action of paper machine calenders.

Sheet brightness was measured on the G.E. brightness meter and sheet opacity (contrast ratio) measurements were made on a Bausch and Lomb opacimeter following standard TAPPI procedure.

Printing was done on a Vandercook No. 4 Proof Press with IPI newsprint ink number NX–2595 at eight different levels of printing blackness ranging between 79 and 94 and at 10 mils impression. Blackness is defined as 100 minus the ratio (expressed as a percent) of the reflectance of the surface of a solid print to the reflectance of the unprinted paper while both are backed with a pile of similar unprinted sheets. The blackness was maintained at any one level with ± 1.0 units of the desired value throughout a series of 96 sheets (one from each set). This was accomplished by small additions of ink between each four to six sheets printed. Blackness was calculated from reflectance readings taken on the Bausch and Lomb opacimeter immediately after each impression.

The printed sheets were conditioned in a constant temperature and humidity room (temperature 72° F. and humidity 50 percent) for a period of 24 ± 3 hours before determining ink strike-through. Strike-through is defined as 100 minus the ratio (expressed as a percent) of reflectance of the back of the printed area to the reflectance of the unprinted sheet while both are backed by a black body. This was calculated from reflectance readings taken on the Bausch and Lomb opacimeter.

From the data obtained with the printed sheets, graphs were made plotting strike-through versus print blackness. This was done for each filler for each level of filler content. From the graphs, the values of strike-through at a blackness level of 90.0 percent were obtained. A second series of graphs were made plotting the values of strike-through at the 90.0 percent blackness level versus percentage filler content.

From the observed values of sheet brightness at each filler loading and the observed brightness value of the unfilled sheet, the increase in brightness was calculated for each filler loading. Values for "Zeolex 23P" and calcined hard clay appear in Table I. By dividing this calculated value by the weight percent of filler for each filler loading, the increase in brightness per percent filler loading was calculated. These values were averaged for the various fillers. Results for "Zeolex 23P" and calcined hard kaolin also appear in Table I. As shown in the table, the calculated average increases in brightness per percent of filler was 0.7 for "Zeolex 23P." The value for the product of the invention, calcined hard clay, was 1.1.

To provide a quantitative basis for comparing the performance of various fillers with the effectiveness of the 93% brightness "Zeolex 23P" as the standard, the average increase in sheet brightness per percent of "Zeolex 23P" was assigned an index value of 1.00. Corresponding index values for the other fillers were obtained by dividing the average brightness increase per percent filler loading by the value for "Zeolex 23P" to establish the relative effectiveness of the two fillers. A value for a filler greater than 1.0 indicates that the material is more effective than "Zeolex 23P." If the value is less than 1.0, this indicates that the material is less effective.

By way of illustration, when the effect per percent of "Zeolex 23P" on brightness was 0.7 and the effect per percent of the calcined hard clay was 1.1 the relative brightness index for hard clay would be 1.1/0.7 or 1.6.

In similar manner, the various fillers were rated for their effect on reducing ink strike-through per percent of filler by dividing the observed strike-through values for each filler by the amount of filler, averaging the results, and assigning the average absolute result for "Zeolex 23P" an ink strike-through reduction index value of 1.0 Values for "Zeolex 23P" and calcined hard kaolin appear in Table I for illustrative purposes. Opacity index values were obtained in the same manner and reported in Table I.

Brightness increase and strike-through reduction index values for various fillers, including the fillers employed in obtaining the results in Table I, appear in Table II.

TABLE I.—EFFECT OF CERTAIN FILLERS ON INK STRIKE-THROUGH, SHEET BRIGHTNESS AND OPACITY OF NEWSPRINT

| Filler, wt. percent | Reduction in ink strike-through | | Increase in paper brightness [1] | | Increase in paper opacity at common sheet weight | |
| | Observed | Increase over fiber per percent of filler | Observed | Increase over fiber per percent of filler | Observed | Increase per percent of filler |
|---|---|---|---|---|---|---|
| "Zeolex 23P": | | | | | | |
| 0.8 | 0.6 | 0.8 | 1.0 | 1.2 | | |
| 1.85 | 4.2 | 2.3 | 1.4 | 0.6 | | |
| 3.86 | 6.5 | 1.7 | 2.4 | 0.6 | 1.8 | 0.5 |
| 4.15 | 10.9 | 2.6 | 2.5 | 0.6 | 2.1 | 0.5 |
| 4.55 | 10.0 | 2.2 | 3.2 | 0.7 | 4.3 | 0.9 |
| 5.10 | 11.1 | 2.2 | 3.2 | 0.7 | 2.5 | 0.5 |
| Average | | 1.9 | | 0.7 | | 0.6 |
| Index (assigned) | | 1.0 | | 1.0 | | 1.0 |
| Product of invention: | | | | | | |
| 0.88 | 1.5 | 1.7 | 1.1 | 1.2 | 0.7 | 0.8 |
| 1.50 | 5.3 | 3.5 | 2.0 | 1.3 | 2.4 | 1.6 |
| 2.32 | 4.9 | 2.1 | 2.6 | 1.1 | 3.6 | 1.5 |
| 2.64 | 6.0 | 2.3 | 3.3 | 1.2 | 4.1 | 1.6 |
| 3.65 | 7.2 | 2.0 | 3.2 | 0.9 | 5.0 | 1.4 |
| 3.67 | 6.4 | 1.7 | 3.2 | 0.9 | 3.6 | 1.0 |
| Average | | 2.2 | | 1.1 | | 1.3 |
| Index (calculated) | | 1.2 | | 1.6 | | 2.1 |

[1] Unfilled sheet brightness = 63 ± 1.

TABLE II.—SUMMARY OF EFFECT OF FILLERS ON INK STRIKE-THROUGH AND SHEET BRIGHTNESS OF NEWSPRINT SHEETS

| Filler | Increase in sheet brightness, index [1] | Reduction in ink strike-through, index [2] |
|---|---|---|
| Commercial fillers: | | |
| "Zeolex 23P" | 1.0 | 1.0 |
| "Hi Sil 404" | 1.3 | 1.1 |
| Kaolin clay products: | | |
| (1) Calcined kaolins: | | |
| Product of invention (calcined hard kaolin) | 1.6 | 1.2 |
| Calcined "Stellar" | 1.3 | 0.5 |
| Calcined "HT" | 1.1 | 0.5 |
| Calcined mechanically delaminated kaolin | 1.0 | 0.4 |
| Calcined "NoKarb" | 0.4 | 0.2 |
| (2) Uncalcined kaolins: | | |
| Hard kaolin | 0.8 | 0.3 |

| Filler | Increase in sheet brightness, index [1] | Reduction in ink strike-through, index [2] |
|---|---|---|
| "Stellar" | 0.7 | 0.1 |
| "HT" | 0.7 | 0.1 |
| "NoKarb" | 0.3 | 0.2 |

[1] Sheet brightness of unfilled paper = 63 ± 3%.
[2] Change (± 0.1) per percent of filler as compared to change per percent of "Zeolex 23P."

Observed data in Table I for the fillers show that the commercial filler and the product of the invention increased sheet brightness and opacity and decreased strike-through when used in amounts within the range of about 1% to 9% of the sheet weight. The data in Table I show that for

both fillers the increases in brightness and opacity and the reduction in ink strike-through were related to the amount of filler used. The effects per unit of filler on brightness and opacity increase and reduction of strike-through were generally greater with the product of the invention.

As mentioned, data in Table II summarize the performance of a variety of clay products and commercially used newsprint fillers. Data in Table II show that the product of the invention was the only kaolin product which was comparable to the commercial newsprint fillers in reducing strike-through. The other clay products, including various calcined kaolins, were markedly inferior to the product of the invention and to the commercially used fillers in this respect. Thus, whereas the product of the invention and the commercial fillers had strike-through reduction index values of at least 1.0, the best clay product outside the scope of the invention (calcined "Stellar," a soft clay) had an strike-through reduction index value of only 0.5. In effect, a given weight of the product of the invention or of the commercial fillers would be expected to be at least twice as effective in reducing ink strike-through as the calcined soft clay.

Index values for the uncalcined clays show that all were quite ineffective in reducing strike-through and that, with the exception of hard clay, calcination did not result in products comparable to the commercial newsprint filler in strike-through reduction properties. The data show that in spite of the fact that the uncalcined hard clay was only about one-third as effective as "Zeolex 23P" the calcined hard clay was 20 percent more effective than the "Zeolex 23P."

Sheet brightness data in Table II show that the product of the invention was superior to the commercial newsprint fillers in improving brightness of the 63 percent brightness newsprint sheet. In contrast, before calcination, the hard kaolin was inferior to the commercial fillers. It was sur-prising that the product of the invention was superior to the commercial fillers in improving sheet brightness since the block brightness of the calcined kaolin clay (93%) was similar to that of "Zeolex 23P" and appreciably less than the 96 percent brightness of "Hi Sil 404."

The brightness data in Table II show also that calcined kaolins as a class were not comparable to the commercial fillers in their effect on brightness although the "Stellar" and "HT" clays were improved substantially by calcination. It was pointed out about, however, that the latter calcined clays were comparatively ineffective in reducing ink strike-through.

Thus, of the various kaolin products, only the product of the invention performed as well as a newsprint filler as the synthetic precipitated fillers.

We claim:

1. A substantially white anhydrous amorphous hard kaolin clay pigment, said pigment being composed of particles substantially all of which are finer than 5 microns and at least 50 percent by weight of which are finer than 1 micron, said pigment having an ASTM oil absorption value within the range of about 60 to 100 g./100 g., a Valley abrasion value below 50 mg., and a B.E.T. surface area within the range of 10 to 20 m.$^2$/g., the pigment containing less than 1 percent by weight of particles coarser than 325 mesh.

2. The pigment of claim 1 which has a G.E. brightness within the range of 92 percent to 95 percent.

**References Cited**

UNITED STATES PATENTS

3,014,836  12/1961  Proctor ..................... 106—2881
3,227,607  1/1966  Mays et al. ................ 106—72
3,353,668  11/1967  Duke ........................ 106—72
3,383,438  5/1968  Allegrini et al. ........ 106—2881

JAMES E. POER, Primary Examiner

U.S. Cl. X.R.

106—72; 23—110

456

UNITED STATES PATENT OFFICE

# CERTIFICATE OF CORRECTION

Patent No. 3,586,523      Dated June 22, 1971

Inventor(s) John R. Fanselow et al.

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

Column 2, line 61, "utilizd" should read -- utilized --. Column 5, line 73, "0.6-0.8" should read -- 10-20 --; line 74, "10-20" should read -- 0.6-0.8 --. Column 7, line 51, "(37 lu./3000 sq. ft." should read -- (37 lb./3000 sq. ft. --; line 55, "wer" should read -- were --; line 62, "contanied" should read -- contained --. Column 8, line 30, "blacknes" should read -- blackness --. Column 9, line 29, "throngh" should read -- through --; line 36, "Prodnct" should read -- Product --.

Signed and sealed this 23rd day of May 1972.

[SEAL]

ROBERT GOTTSCHALK
Commissioner of Patents

ATTEST:

ATTESTING OFFICER